1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ROSALINDA H.,[1]              ) Case No. SACV 19-1622-JPR
                                  )
12                   Plaintiff,   )
                                  ) **MEMORANDUM DECISION AND ORDER**
13            v.                  ) **REVERSING COMMISSIONER**
                                  )
14  ANDREW SAUL, Commissioner     )
    of Social Security,           )
15                                )
                     Defendant.   )
16  _____)

17  **I.    PROCEEDINGS**

18        Plaintiff seeks review of the Commissioner's final decision

19  denying her applications for Social Security disability income

20  benefits ("DIB") and Supplemental Security Income ("SSI").  The

21  parties consented to the jurisdiction of the undersigned under 28

22  U.S.C. § 636(c).  The matter is before the Court on the parties'

23  Joint Stipulation, filed May 12, 2020, which the Court has taken

24  under submission without oral argument.  For the reasons stated

25  below, the Commissioner's decision is reversed and this action is

26  _____

27        [1] Plaintiff's name is partially redacted in line with
    Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
28  recommendation of the Committee on Court Administration and Case
    Management of the Judicial Conference of the United States.

                                    1

1  remanded for further proceedings.

2  **II.  BACKGROUND**

3      Plaintiff was born in 1972.  (Administrative Record ("AR")

4  344.)  She completed high school (AR 386) and last worked as a

5  billing clerk (AR 116-17, 386, 393-94).

6      Plaintiff applied for DIB and SSI on October 19 and 30,

7  2015, respectively, alleging a disability onset date of August

8  18, 2015, based on fibromyalgia, migraines, restless-leg

9  syndrome, and sleep apnea.  (AR 344-50, 385-86.)  After her

10 applications and requests for reconsideration were denied (AR

11 225-40, 243-60, 265-69, 271-75), she requested a hearing before

12 an Administrative Law Judge (AR 276-77).  One was held on

13 February 13, 2018, at which Plaintiff, who was represented by

14 counsel, testified, as did a vocational expert.  (AR 112-34.)  In

15 a written decision issued May 31, 2018, the ALJ found her not

16 disabled.  (AR 97-110.)  She sought Appeals Council review

17 (see AR 340-43, 475-76), which was denied on July 10, 2019 (AR 1-

18 7).  This action followed.

19 **III. STANDARD OF REVIEW**

20     Under 42 U.S.C. § 405(g), a district court may review the

21 Commissioner's decision to deny benefits.  The ALJ's findings and

22 decision should be upheld if they are free of legal error and

23 supported by substantial evidence based on the record as a whole.

24 See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

25 Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

26 means such evidence as a reasonable person might accept as

27 adequate to support a conclusion.  Richardson, 402 U.S. at 401;

28 Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

2

1  is more than a scintilla but less than a preponderance.

2  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

3  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the

4  meaning of 'substantial' in other contexts, the threshold for

5  such evidentiary sufficiency is not high." Biestek v. Berryhill,

6  139 S. Ct. 1148, 1154 (2019).  To determine whether substantial

7  evidence supports a finding, the court "must review the

8  administrative record as a whole, weighing both the evidence that

9  supports and the evidence that detracts from the Commissioner's

10  conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

11  1998).  "If the evidence can reasonably support either affirming

12  or reversing," the court "may not substitute its judgment" for

13  the Commissioner's. Id. at 720-21.

14  **IV.  THE EVALUATION OF DISABILITY**

15      People are "disabled" for purposes of receiving Social

16  Security benefits if they are unable to engage in any substantial

17  gainful activity owing to a physical or mental impairment that is

18  expected to result in death or has lasted, or is expected to

19  last, for a continuous period of at least 12 months.  42 U.S.C.

20  § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

21  1992).

22      A.   The Five-Step Evaluation Process

23      The ALJ follows a five-step evaluation process to assess

24  whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4),

25  416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.

26  1995) (as amended Apr. 9, 1996).  In the first step, the

27  Commissioner must determine whether the claimant is currently

28  engaged in substantial gainful activity; if so, the claimant is

3

not disabled and the claim must be denied.  §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).

    If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting her ability to do basic work
activities; if not, the claimant is not disabled and her claim
must be denied.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) & (c).

    If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set
forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,
disability is conclusively presumed.  §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii) & (d).

    If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant
has sufficient residual functional capacity ("RFC")[2] to perform
her past work; if so, she is not disabled and the claim must be
denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant
has the burden of proving she is unable to perform past relevant
work.  Drouin, 966 F.2d at 1257.  If the claimant meets that
burden, a prima facie case of disability is established.  Id.

_____

    [2] RFC is what a claimant can do despite existing exertional
and nonexertional limitations.  §§ 404.1545(a)(1), 416.945(a)(1);
see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).
The Commissioner assesses the claimant's RFC between steps three
and four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir.
2017) (citing § 416.920(a)(4)).

If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 416.960(b).

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 18, 2015, the alleged onset date; her date last insured was December 31, 2020.  (AR 99.)  At step two, he concluded that she had the severe impairment of fibromyalgia.  (AR 100.)  At step three, he determined that her impairment did not meet or equal a Listing. (AR 102.)  At step four, he found an RFC allowing her to perform a range of light work:

> the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk for six hours out of an eight-hour workday; can sit for six hours out of an eight-hour workday; cannot climb ladders, rope or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; and can frequently balance.

(Id.)  The ALJ concluded that Plaintiff could do her past relevant work as a billing clerk as generally performed in the national economy.  (AR 104-05.)  Thus, he found her not disabled. (AR 105.)

5

**V.   DISCUSSION**

   A.   <u>The ALJ Did Not Properly Evaluate Plaintiff's</u>
        <u>Subjective Symptom Testimony</u>

   Plaintiff claims that the ALJ "failed to provide clear and convincing reasons to reject [her] subjective limitations." (J. Stip. at 4.) As explained below, the ALJ erred, and remand is warranted.

        1.   <u>Applicable law</u>

   An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)).

   In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. <u>See Lingenfelter</u>, 504 F.3d at 1035-36; <u>see also</u> SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." <u>Lingenfelter</u>, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged."

Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony.  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

2.  Relevant background

a.  *Plaintiff's relevant medical history*

Plaintiff saw family-medicine practitioner Luis Villa for fibromyalgia on March 31, 2015.  (AR 482-84.)  Her "[a]ggravating factors include[d] muscular aches and pains and arthralgias,"[3] and her symptoms were "chronic and . . . poorly controlled."  (AR 482.)  Dr. Villa assessed her with myalgia and myositis,[4]

_____

[3] Arthralgias are aching pains in the joints without swelling.  Arthritis vs. Arthralgia: What's the Difference?, Healthline, https://www.healthline.com/health/rheumatoid-arthritis/arthralgia (last visited Mar. 24, 2021).

[4] Myalgia are muscle aches.  What You Need To Know About Muscle Aches and Pains, Healthline, https://www.healthline.com/health/muscle-aches (last visited Mar. 24, 2021).  Myositis is chronic, progressive muscle inflammation thought to be an autoimmune condition that causes the body to attack the muscles;

7

"addressed her [fibromyalgia] and its effects on her pain and
emphasized [a] heart healthy diet . . . [and] her weight," and
noted "[e]levated ferritin,"[5] chronic nonalcohol-related liver
disease, and "prediabetes." (AR 483.) He referred her to a
rheumatologist, describing her as a "patient with severe
fibromyalgia in need of further treatment." (Id.; see also AR
488.)

Rheumatologist Andrew Concoff examined Plaintiff on June 10,
2015. (AR 590-93.) She reported the "gradual onset of body
aches [with] bone popping [and] pain in 2007" and "head to toe"
pain that "fe[lt] like [a] big bruise." (AR 590.) Her
"shoulders, el[bo]ws, wrists, knees, and low back" were affected.
(Id.) She also complained of lower-back pain that "radiate[d] to
[her] bilateral lateral hips" and "[p]ain with sitting and
standing" and "light palpation of [the] skin." (Id.) Her pain
had become "10 [times] worse, and cause[d] her to miss work."
(Id.) She reported "difficulty falling and staying asleep,"
"disrupted" sleep from pain with movement, "[d]aytime fatigue,"
"hair thinning," recurring stress-induced skin rash to her chin,
and "[r]ecurrent" urinary tract infections. (Id.) Her symptoms
were "constant," and her pain level was nine of 10, radiating to
her back, hips, and shoulders. (AR 591.) She had been taking

---

researchers believe it may be caused by rheumatoid arthritis,
lupus, viruses, or drug toxicity. What Is Myositis and How Can
It Be Treated?, Healthline, https://www.healthline.com/health/
myositis#causes (last visited Mar. 24, 2021).

[5] Ferritin is a blood protein containing iron; an elevated
level may signify liver disease, rheumatoid arthritis, other
inflammatory conditions, or hyperthyroidism. Ferritin Test, Mayo
Clinic, https://www.mayoclinic.org/tests-procedures/ferritin-
test/about/pac-20384928 (last visited Mar. 24, 2021).

Cymbalta[6] daily since 2007.  (AR 590.)

Dr. Concoff's systems review revealed fatigue, "headache[s]," "night sweats," and "recent weight gain [of] 40 [pounds]"; "[w]orsening central vision, foreign body sensation in eye, dryness of the eyes, eye pain, [and] bloodshot eyes"; "chest pain or discomfort and palpitations," "[d]yspnea,"[7] and "[h]eartburn and nausea"; "nocturia and dysuria"[8]; "muscle weakness, sexual complaints, . . . loss of hair from the head or body," "easy bruising," "[m]uscle aches, arthralgias, muscle spasms, swelling localized to one or more joints wrist/shoulders/back/hips/knees/ankles, [and] "localized joint stiffness . . . worse in the morning 2 hours"; "[d]izziness and hyperesthesia"[9]; "[a]nxiety with persistent worry, depression and initial insomnia"; and "[p]hotosensitivity."  (AR 592.) Examination found cervical spine "abnormalities," 18 of 18

---

[6] Cymbalta, or duloxetine, treats depression and anxiety. See Cymbalta, WebMD, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Mar. 24, 2021).  It is also approved for use to help relieve nerve and back pain associated with fibromyalgia.  See id.

[7] Dyspnea is shortness of breath.  Dyspnea, Healthline, https://www.healthline.com/health/dyspnea (last visited Mar. 24, 2021).

[8] Nocturia is having to urinate often during the night. Nocturia, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/14510-nocturia (last visited Mar. 24, 2021). Dysuria is painful urination.  Dysuria, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15176-dysuria-painful-urination (last visited Mar. 24, 2021).

[9] Hyperesthesia is an increased sensitivity to sight, touch, sound, or smell.  Hyperesthesia, Healthline, https://www.healthline.com/health/hyperesthesia (last visited Mar. 24, 2021).

fibromyalgia tender points,[10] and "abnormal posture," with "rounded shoulders" but normal otherwise.  (AR 592-93.)

On July 1, 2015, Dr. Concoff evaluated Plaintiff for fibromyalgia and lupus and reviewed her lab results.  (AR 689.) She reported that her pain had worsened, causing her to miss work the two days prior, and she had stumbled and fallen from lower-back and knee pain.  (Id.)  Among other things, her active problems were "[a]bnormal antinuclear antibody,"[11] "[a]rthropathy of multiple sites," "[f]atigue," "[m]igraine headache," and "[m]orning stiffness of joints."  (Id.)  Examination results showed cervical-spine abnormalities and 18 of 18 fibromyalgia tender points.  (AR 690.)  He administered "Depo Medrol 80 mg into [her] left deltoid"[12] and recommended further testing for "systemic autoimmunity" and that she continue to take Cymbalta,

---

[10] Tender points are 18 specific areas of the body tested under the pre-2010 diagnostic approach for fibromyalgia; if 11 of them were tender when firm pressure was applied, a positive diagnosis was supported.  Fibromyalgia: Understand How It's Diagnosed, Mayo Clinic, https://www.mayoclinic.org/ diseases-conditions/fibromyalgia/in-depth/fibromyalgia-symptoms/ art-20045401 (last visited Mar. 24, 2021).  Because fibromyalgia symptoms can come and go and be associated with other conditions that must be excluded, diagnostic guidelines now require finding "widespread pain throughout [the] body for at least three months," with "widespread" meaning "pain on both sides of [the] body, as well as above and below [the] waist."  Id.

[11] Antinuclear antibody, or ANA, tests measure the amount of antibodies made by the immune system, too many of which can signify an autoimmune disease.  Antinuclear Antibody Panel (ANA Test), Healthline, https://www.healthline.com/health/ antinuclear-antibody-panel (last visited Mar. 24, 2021).

[12] Depo-Medrol, or methylprednisolone, is a corticosteroid hormone injected to treat pain and swelling occurring with arthritis and other joint disorders.  Depo-Medrol Vial, WebMD, https://www.webmd.com/drugs/2/drug-6160/depo-medrol-injection/ details (last visited Mar. 24, 2021).

obtain a sleep study, and consider "pool therapy,"[13] "acupuncture," "biofeedback/mindfulness meditation," and vitamin D.  (AR 690, 693.)

On August 20, 2015, Dr. Concoff reviewed test results and ordered "further labs for systemic autoimmunity," recommending that Plaintiff remain "off work until follow-up" and "consider [a] pain management program."  (AR 686-87.)  She had reported worsening pain, with "pins and needles" in her "right deltoid area and right thigh," "near accidents in car from driving," "[l]osing stren[g]th from sharp pains to knees," and continued severe lower-back pain and worsened sleep because of pain.  (AR 684.)

Pain specialist Arthur Zepeda examined Plaintiff on September 24, 2015.  (AR 679-83.)  She reported constant pain, describing it as "heavy, tender, splitting[] sensation, stabbing, punishing-cruel sensation, and a throbbing, cramping, hot-burning, aching, tiring-exhausting, sickening[] sensation" that was worse with "bending, lifting, coughing, sneezing, sexual intercourse, standing a long time, sitting a long time, [and] walking."  (AR 679.)  She also felt "blue all the time."  (Id.) His examination yielded mostly normal results, with a normal range of motion, except "[p]alpation of the thoracic and lumbar facets and lumbar intervertebral spaces reveal[ed] pain," as did "palpation of the cervical facets," and she had pain with cervical-spine movement and "palpable trigger points in the muscles of the head and neck."  (AR 681.)  He recommended a

_____

[13] Plaintiff apparently later "[d]ecline[d] Aqua-therapy." (AR 211, 780.)

"chronic pain program"; prescribed an anti-inflammatory, a cream for her knees and shoulders, and a restless-leg medication; and suggested a possible increase in Cymbalta dosage. (AR 683.)

On October 22 and December 18, 2015, Plaintiff answered pain-management questionnaires, indicating "constant" pain averaging from five to nine of 10, made worse by bending, prolonged sitting, coughing, sneezing, lifting, prolonged standing, sexual intercourse, and walking. (AR 651-52.)

At her next appointment with Dr. Concoff, in October 2015, he found that the further laboratory tests were "without conclusive evidence of systemic autoimmunity" and continued her prescriptions and his recommendations for alternative therapies and a pain-management program. (AR 678; see AR 674-77.) Several appointments with her primary-care provider for chronic pain and other complaints at the end of 2015 indicate that she was awaiting referral to such a program. (See AR 659, 673.)

Plaintiff had check-ups and fibromyalgia follow-ups with family-medicine specialist Jose L. Valdez from March 3, 2016, to February 20, 2017. (See AR 622-36.) Dr. Valdez referred her to an "in-network rheumatologist," assessing her with fibromyalgia, "chronic pain," "restless leg syndrome," "menopause syndrome," "migraine syndrome," and "BRCA 2 [positive]."[14] (AR 623-24.) On July 19, 2016, he noted that "fibromyalgia — improve[d with]

---

[14] BRCA2, or breast cancer gene two, means the patient possesses a harmful variant of the gene that elevates the risk of developing breast or ovarian cancer. BRCA Gene Mutations: Cancer Risk & Genetic Mutations, Nat'l Cancer Inst., https://www.cancer.gov/about-cancer/causes-prevention/genetics/brca-fact-sheet (last visited Mar. 24, 2021).

gabapentin,"[15] and on February 2, 2017, he noted her request for referral to a rheumatologist for "worsening joint pain," including "both hands [with] inflammation" and "tenderness."  (AR 627, 633.)  At the February appointment, he further remarked that "pain [wa]s at its worst" during the "past 2 months."  (AR 634.)

Treatment records from Arthritis and Osteoporosis Medical Center from March 26, 2017, to February 9, 2018, show exam findings of neck, shoulder, and knee pain and "abnormal" and limited range of motion in the shoulders, knees, and cervical spine at every appointment.  (See AR 208-21, 752-62, 765-67, 773-74, 777-78, 782-83.)  She had 12 of 18 positive trigger points at appointments in April, May, June, October, and December 2017 and February 2018.  (AR 210, 762, 767, 774, 778, 783.)  Her treatment plan included myofascial trigger-point injections[16] and various medications.  (AR 763-64, 770-71, 775.)  An MRI of her lumbar spine on November 17, 2017, was largely unremarkable except for a "central disc bulge measuring approximately 2.5 [millimeters]" at L5-S1, with "no significant spinal canal compromise."  (AR 759.)

Treatment records from MD Health Clinics reveal appointments weekly in December 2017 and January 2018 for fibromyalgia,

---

[15] Gabapentin, brand-named Neurontin, is an anticonvulsant that "works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system."  Gabapentin, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Mar. 24, 2021).

[16] Myofascial trigger-point injections involve injecting small amounts of anesthetic and steroid into trigger points to relieve pain associated with fibromyalgia.  Trigger Point Injections, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/17582-trigger-point-injection (last visited Mar. 24, 2021).

anxiety, migraines, bilateral knee pain, rheumatoid arthritis, insomnia, and shoulder and back pain.  (See AR 747-51.)  An undated medication list reflects that Plaintiff had taken various opiod-based medications, among others.  (AR 466.)

b.  *Plaintiff's statements*

On November 28, 2015, Plaintiff stated in a function report that her ability to work was limited by "severe fibromyalgia for over 7 y[ea]rs[,] migraines," and insomnia "due to pain [and] restless leg syndrome."  (AR 397; see AR 398-405.)  Her daily activities included a "little bit of walking, sitting from time to time," and lying down "due to severe body pains."  (AR 398.)  She was "unable to help" take care of her husband and 13-year-old son,[17] and her sleep was disrupted by "sleep apnea" and "severe" fibromyalgia, with "pain from head to toe."  (Id.)  Her husband helped her dress, bathe, and take care of her hair because her arm and shoulder pain limited her movement.  (Id.)  He helped her out of bed because her "arms, shoulder, knees, [and] legs, [we]re very painful."  (Id.)  He also prepared meals because she couldn't move her wrist, and her "wrists, arms, [and] hands" were "to[o] painful."  (AR 399.)  Pain prevented her from doing daily chores.  (Id.)  She didn't go out alone because her pain would cause her to "lose strength in [her] body," and she often stayed in the car while her husband bought groceries because of "too much pain."  (AR 400.)

_____

[17] In July 2018, however, Plaintiff told a psychiatrist that she was "stressed" from "being sole care taker of h[u]sband and both elderly and sickly mother and father in law."  (AR 60; see also AR 60, 65-66 (noting that Plaintiff was "primary caretaker of husband who has brain tumor and is disabled").)

Her interests included "spending family time," but she hadn't done that "at all in the past y[ea]r since her pain" had become "severe." (AR 401.) She hadn't participated in social activities in over a year because she couldn't walk much and would need to lie down. (AR 402.) Her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands was affected, and she could not lift at all because of the pain in her shoulders and entire body. (Id.) She could pay attention for only about five minutes before needing to rest, move, or lie down; had trouble finishing tasks; and felt depressed and didn't handle stress well because her pain made her "very emotional." (AR 402-03.) She feared insomnia and her progressing pain and depression. (AR 403.) She couldn't take medicine for her migraines because it interacted with her fibromyalgia medicine, so she slept "very little due to severe body pains from head to toe [and] restless leg syndrome." (AR 404.)

At her hearing, Plaintiff described having fibromyalgia for 10 years and feeling widespread "[h]ead to toe" pain that felt like "a big bruise, a walking bruise — so severe that it's very hard to even type, hold my arms, my back, my lower back, my knees." (AR 120.) She reported "daily" migraine — not "regular" — headaches that lasted for "weeks." (Id.; see AR 128.) When she had a migraine, she would need to "[l]ay down for hours and hours," and that happened "almost on a daily basis." (AR 128.) Her sleep medication had stopped working, so she was "going through pain management with different types of medication." (AR 120.) She typically slept an hour a night, "if that." (AR 121.)

The ALJ went through her list of medications, and Plaintiff
described having "fog moments," including "getting lost when
[she] dr[o]ve," being "very forgetful," and lacking
"concentration," which she had been told could be side effects of
her medicine.  (AR 123.)

Plaintiff tried to cook and clean but had "many pauses in-
between from [her] back and [her] pains" and was "so forgetful";
sometimes she had to "stop and think where [she was] going when
[she was] driving," which was "[s]cary."  (AR 127.)

c.  *The ALJ's decision*

The ALJ found that Plaintiff's "medically determinable
impairments could reasonably be expected to cause the alleged
symptoms; however, [her] statements and allegations concerning
the intensity, persistence and limiting effects of these symptoms
[we]re not entirely consistent with the medical evidence and
other evidence in the record."  (AR 103.)  He gave three reasons
for discounting her symptom statements and testimony: (1)
"diagnostic findings . . . show[ed] no significant neurological
deficits or gait abnormalities to justify greater functional
restrictions"; (2) she had had "rather conservative" treatment;
and (3) there was "little documentation" of the side effects she
complained of at the hearing.  (AR 104.)  He further noted that
she "had complaints of muscular aches and pains for which she was
prescribed Cymbalta," but there was "no known history of
rheumatoid arthritis."  (AR 103.)  "Her examination revealed
numerous trigger point tenderness [sic] in the shoulder, knees,
and back; however, her gait, motor and balance were normal."
(Id.)  Subsequent treatment notes in 2015 "conveyed normal

16

physical examination findings except for diffuse tenderness to palpation"; she was referred for pain management, pool therapy, acupuncture, and biofeedback therapy; and medication was titrated upward for "better symptom control."  (Id.)

The ALJ recognized that treatment notes from 2016 and 2017 reflected that Plaintiff complained of "worsened fibromyalgia pain, but her physical examination findings remained largely unremarkable except for tenderness to palpation of trigger points and neck and back pain with limited range of motion in the spine."  (AR 104.)  Further, a lumbar-spine MRI "showed minimal degenerative changes," and "there [wa]s no indication that she underwent further treatment outside of oral pain medications."  (Id.)

Explaining that "there [wa]s little doubt that [Plaintiff] experience[d] pain and discomfort due to fibromyalgia," the ALJ concluded that "the objective medical evidence d[id] not support the alleged severity of symptoms."  (Id.)  He found that she had not been "deprived of the ability to perform work" consistent with the RFC "for any 12-month period since the alleged onset date."  (Id.)

3.  Analysis

The ALJ failed to properly analyze Plaintiff's subjective symptoms, discounting her testimony and statements based on "an apparent fundamental misunderstanding of fibromyalgia."  Revels v. Berryhill, 874 F.3d 648, 662 (9th Cir. 2017) (collecting cases showing "recurrent problem" of ALJs failing "to properly analyze . . . fibromyalgia-related symptoms").  The ALJ discounted Plaintiff's testimony because she "complained of worsened

fibromyalgia pain [in 2016 and 2017], but her physical examination findings remained largely unremarkable except for tenderness to palpation of trigger points and neck and back pain with limited range of motion of the spine."  (AR 104.)  But there are no laboratory tests to confirm the presence or severity of fibromyalgia, which is "diagnosed entirely on the basis of patients' reports of pain and other symptoms."  Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004).  Indeed, "[o]ne of the most striking aspects of this disease is the absence of symptoms that a lay person may ordinarily associate with joint and muscle pain."  Rollins v. Massanari, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting); see also Cota v. Comm'r of Soc. Sec., No. 1:08-CV-00842-SMS, 2009 WL 900315, at *9 (E.D. Cal. Mar. 31, 2009) ("Joints in fibromyalgia patients appear normal; musculoskeletal examinations generally indicate no objective joint swelling or abnormality in muscle strength, sensory functions, or reflexes."), judgment vacated on other grounds by 2010 WL 289294 (E.D. Cal. Jan. 15, 2010).

The medical records show Plaintiff's consistent complaints of generalized muscle pain, tender points, fatigue, and sleep problems, all of which are indicative of fibromyalgia.  (See AR 201-03, 209-10, 216-17, 516-20, 521, 574-76, 590-93, 599, 651-52, 671-73, 674-78, 762, 767, 774, 778, 783); Benecke, 379 F.3d at 590 (noting common symptoms of fibromyalgia as "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease").  Thus, the lack of abnormal objective findings on examination was not a

1  sufficient basis for rejecting Plaintiff's subjective symptom

2  statements in the face of her undisputed fibromyalgia diagnosis.

3  See generally Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.

4  1975) (ALJ erred by relying upon "his own exploration and

5  assessment" of plaintiff's medical condition rather than medical

6  evidence in record).  The ALJ did not place in context the

7  evidence of Plaintiff's multiple tender-trigger-point findings,

8  sleep disturbance, anxiety, depression, brain fog, fatigue, and

9  chronic, widespread pain lasting over three months.  See SSR 12-

10 2p, 2012 WL 3104869 (July 25, 2012) (governing SSA's

11 consideration of fibromyalgia);[18] Revels, 874 F.3d at 656

12 (recognizing fibromyalgia "as a valid basis for a finding of

13 disability" when analyzed using SSR 12-2p criteria).

14     The ALJ also erred in rejecting Plaintiff's testimony based

15 on her not having "under[gone] further treatment outside of oral

16 pain medications as previously advised," amounting to "rather

17 conservative medical management" of her fibromyalgia.  (AR 104.)

18 In fact, Plaintiff also received steroid injections.  (See AR

19 684, 780); see, e.g., Revels, 874 F.3d at 667 (finding opioid

20 medications and steroid injections not conservative treatment for

21 fibromyalgia).  Thus, her allegedly conservative treatment could

22 not support discounting her statements and testimony.

23     Because the ALJ analyzed the medical evidence using improper

24 criteria, his assessment of Plaintiff's subjective symptom

25 _____

26     [18] One of the preconditions for a diagnosis of fibromyalgia
   is that there be no other cause of the patient's symptoms.  See
27 SSR 12-2p, 2012 WL 3104869, at *3.  Here, the ALJ found that
   Plaintiff had no other severe impairments besides fibromyalgia
28 (AR 100); thus, it had to have been the cause of her pain and
   other symptoms.

1    testimony was necessarily flawed.  Remand is required.[19]

2         B.  <u>Remand for Further Proceedings Is Appropriate</u>

3         When an ALJ errs, the Court "ordinarily must remand for

4    further proceedings."  <u>Leon v. Berryhill</u>, 880 F.3d 1041, 1045

5    (9th Cir. 2017) (as amended Jan. 25, 2018); <u>see also</u> <u>Harman v.</u>

6    <u>Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended).  The

7    Court has discretion to do so or to award benefits under the

8    "credit as true" rule.  <u>Leon</u>, 880 F.3d at 1044 (citation

9    omitted).  "[A] direct award of benefits was intended as a rare

10   and prophylactic exception to the ordinary remand rule[.]"  <u>Id.</u>

11   at 1045.  The "decision of whether to remand for further

12   proceedings turns upon the likely utility of such proceedings,"

13   <u>Harman</u>, 211 F.3d at 1179, and when an "ALJ makes a legal error,

14   but the record is uncertain and ambiguous, the proper approach is

15   to remand the case to the agency," <u>Leon</u>, 880 F.3d at 1045 (citing

16   <u>Treichler</u>, 775 F.3d at 1105).

17        Here, further administrative proceedings would serve the

18   useful purpose of allowing the ALJ to give proper consideration

19   to Plaintiff's fibromyalgia diagnosis and subjective symptom

20   testimony.  But although the ALJ did not expressly say so, some

21   specific portions of Plaintiff's testimony did seem exaggerated:

22   it's hard to imagine that she could function at all, much less

23   occasionally grocery shop, cook, clean, and do other household

24   chores, if she truly got at most an hour of sleep a night and was

25

26        [19] Even assuming the ALJ did not err in finding that the
     side effects Plaintiff complained of at the hearing were not
27   documented in the records, that alone would not justify
     discounting her statements and testimony, particularly in light
28   of the flaws in the other two proffered reasons.  After all, the
     side effects could simply have increased with time.

almost never without a genuine migraine headache.[20]  (AR 120-21.)
Moreover, inconsistencies exist in the record concerning whether
she took care of her husband or he of her.  (<u>Compare</u> AR 65-66,
<u>with</u> AR 398.)  It's hard to reconcile her statements about
needing to lie down for "hours and hours" every day and being
essentially nonfunctional (AR 128, 397-405) with caring for a
disabled husband and his parents (AR 65-66).  When a court has
"serious doubt" about whether a plaintiff is disabled, remand for
further proceedings is appropriate.  <u>See</u> <u>Treichler</u>, 775 F.3d at
1107.  If the ALJ chooses to again discount Plaintiff's
subjective symptoms on remand, he can then provide an adequate
discussion of the reasons why.  <u>See</u> <u>Payan v. Colvin</u>, 672 F. App'x
732, 733 (9th Cir. 2016).

**VI.   CONCLUSION**

   Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[21] IT IS ORDERED that judgment be entered
REVERSING the Commissioner's decision, GRANTING Plaintiff's
request for remand, and REMANDING this action for further
proceedings consistent with this memorandum decision.


DATED: March 26, 2021         _____
                              JEAN ROSENBLUTH
                              U.S. MAGISTRATE JUDGE

---

   [20] Plaintiff had a sleep study in June 2015 and was found to
have "mild" sleep apnea caused at least in part by her obesity.
(AR 598-99.)

   [21] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."